GEORGIA,
Camden Co.
JUNE, 18¹0.

Carnochan
vs.
Abrahams.

*Minutes of Superior Court, letter G. p.* 345.

*Chambers, June* 16, 1810.

## CARNOCHAN *vs.* ABRAHAMS.

### ADMINISTRATION.

By *Charlton*, Judge.

THIS case comes before me, on an appeal from a decision of the court of ordinary, of Glynn county ; and the question for my determination is,whether the appellant, *Carnochan*, or the appellee, *Abrahams*, is entitled to administration on the estate of *Thomas B. M'Kinnon.*

The history of the case is, I think, as follows :—Upon the death of *Thomas B. M'Kinnon*, the court of ordinary of Glynn, in consequence of some intermeddling with the estate by Mr. *Carnochan*, granted letters *ad colligendum* to their clerk, *John Saunders.* In consequence of a mandamus from this court, a citation was issued, informing the public of the application which had been made by the clerk, and inviting all persons in the usual form, to show cause why administration should not be granted to *him.* The court of ordinary, at the period appointed for the contestation of the administration in the citation, confers the administration upon their clerk. It appears that *Carnochan* did not attend to dispute the right of *Saunders* to the administration, and the reason for this neglect, is stated to have been occasioned by the occurrence of some family affliction. A caveat was, however, interposed by Mr. *Carnochan ;* and upon the decision of the court of ordinary, that their clerk was entitled to the administration, Mr. *Carnochan* has applied to this jurisdiction. From the mass of evidence before me, I collect, that the decision of the court of ordinary was founded upon the commission of certain acts by *Carnochan,* relative to the estate, which usurped the powers of the court of ordinary ; and which constituted him an

*executor de son tort.* The court conceived, that by his inter-
meddling with the property, he had evinced a contempt and
disregard of the authority which the laws exclusively vested
in the courts of ordinary, and which rendered it improper and
dangerous to the interests of the estate, to confer the adminis-
tration *upon him.*

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

*Carnochan,* on the other hand, contends, that he did not
intermeddle with the estate in any manner, which could either
evince a want of respect for the legal authority of the court
of ordinary, or that could constitute him an *executor de son
tort ;* and that he *was* at the time the administration was con-
ferred upon *Saunders,* and subsequently upon his successor,
Mr. *Isaac Abrahams,* and *is now* entitled to the administration
upon the following grounds :

1. Because he is a principal creditor ; and,

2. Because he has been duly empowered and au-
thorized, to apply for administration by all the nearest of kin,
and others, the principal creditors of the deceased.

These were the grounds taken by Mr. *Bulloch,* and they
were made the basis of the arguments of the other learned
counsel on that side.

The counsel for the *appellee* contend, that he is entitled
to the administration :

1. Because he is also a creditor.

2. Because the principal creditor is not entitled to the ad-
ministration, as a matter of right, for that, on a failure of kin-
dred, it is discretionary with the court of ordinary to grant
the administration to a creditor, or *any other person.*

3. Because the court of ordinary have exercised this dis-
cretionary authority, and therefore it is not competent for
this tribunal, acting as an appellate jurisdiction, to revoke
that administration, unless fraud, corruption, and partiality,
appear to influence the proceedings of the court below.

4. Because the intermeddling with the estate, and thereby
making him an *executor de son tort,* he had divested himself
of the right (if he possessed any) to the administration as
principal creditor.

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

I shall, in the first place, examine the grounds of the appellant.

1. Is he a principal creditor?

2. What are the rights delegated to him by the nearest of kin, and some of the principal creditors?

1. Is he a principal creditor?

In support of his pretensions as a principal creditor, Mr. *Carnochan* exhibits two accounts; the one, for articles furnished and monies advanced to Mr. *M'Kinnon*, in his life time, amounting to $669,60 cents; the other, for articles furnished and disbursements made for the use and benefit of *the estate of Mr. M'Kinnon*, amounting to $333,59 cents.

I made the enquiry and was informed, that the large account was laid before the court of ordinary.

It appears from the testimony of Mr. *Hamilton*, that *Hamilton* and *Cowper* were creditors of Mr. *M'Kinnon*, on bond and mortgage for the amount of $3000, and that it was their intention to apply for administration; but that they were induced to relinquish that intention, in consequence of a representation from *Carnochan*, that if *he* got the administration, it was his determination to bring the affairs of the estate to " as speedy a close as possible," and in consequence of *Carnochan's* having advanced the amount of an instalment then due upon *M'Kinnon's* bond. Upon the footing of this species of compromise, *Hamilton* and *Cowper* consented to waive their application for administration.

It is not in the evidence, that there is any other domestic creditor, claiming as large an amount as the debt due to *Carnochan*. I allude to the account of $669,60 cents; for his right to the administration must be bottomed upon that account, as his pretensions to the administration must rest upon a right which existed *antecedent* to the intestate's death. I therefore cannot, and do not, connect with this account, the demand which was created *subsequent* to the intestate's death.

I take it for granted, then, (as nothing to controvert it appears,) that Mr. *Carnochan* is the next principal creditor in

this state.   This point being disposed of, I am brought to
the consideration of the second.

2. What are the rights derived from the powers delega-
ted to the appellant, by the next of kin, and principal foreign
creditor?

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

It was alleged in the argument of one of the counsel for
*Carnochan*, that *Alexander C. Wylly*, residing in the county
of *Glynn*, is one of the nearest of kin in this state, to the in-
testate, and that he had relinquished his right to the adminis-
tration, in favor of the appellant.   The fact of his being one
of the kindred of the intestate does not appear from any
part of the evidence submitted to me.   I find, that a citation
was issued on the 13th day of January, 1808, which states,
that Mr. *Wylly* had applied for letters of administration on
the estate and effects of *Thomas B. M'Kinnon, for the benefit
of the heirs and creditors.*   If he had applied as next of kin
in this state, it should have been so expressed in the citation.
I am to presume, therefore, that he is not related to the
intestate.   *Expressio unius, est, exclusio alterius.*

Be this, however, as it may, Mr. *Wylly* did, by his letter
of the 7th of February, 1808, agree to transfer his right to
the administration ; provided he, *Carnochan*, would withdraw
a caveat he had entered against *Wylly's* application.   That
this arrangement was made, is evidence by the transcript of
the proceedings of the court of ordinary, of the 2d of May
1808, which reject the application of *Carnochan* for the ad-
ministration, and confer upon *Saunders* their clerk, letters
*ad colligendum.*   In the proceedings of that day, no notice is
taken of *Wylly's* application, which presupposes a knowledge
on the part of the court, that he had made the arrangement
suggested, as it was the regular period, at which his applica-
tion should have been decided upon by the court.   This
combination of circumstances prove, beyond a doubt, I think,
that *Wylly* had transferred his right to *Carnochan*.   *Couper*
and *Hamilton* then, and *A. C. Wylly*, having abandoned in
favour of the appellant their rights or pretensions to the ad-
ministration, the only competitors left (save the clerk of the

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

court of ordinary) were the brother and sister of the intes-tate, (the former residing in the *Bahamas*, the latter in *Lon-don*,) and the foreign British creditors.

It is said, that *Charles M'Kinnon*, the brother, and *Lydia Haven*, the sister, as well as the foreign creditors, have de-volved upon the appellant all the rights which they possess-ed to the administration. For the purpose of establishing this, various powers of attorney, and other documents were produced, which are alleged to be a complete and full de-legation to *Carnochan*, of all the claims which the brother, sister, and those foreign creditors could possibly have had to the administration.

I have looked into these powers of attorney, and docu-ments, and shall now advert to them in the order in which they were introduced by the appellant's counsel.

The first is a power of attorney from *William Ogilvy*, the younger ; *George Mylne*, and *John Chalmers*, merchants of the city of London, carrying on business under the firm of *Ogilvy, Mylne*, and *Company*. It appoints Mr. Carnochan their attorney, to collect the debts due the firm, from the citizens, or other persons in the *United States ;* and for this purpose, it confers on him a very extensive authority.

The lord chancellor, *Erskine*, granted a commission of bankruptcy against this firm, and *Thomas Hugon, John Tunno, David Gordon, George Hobson*, and *John Auldjo*, were ap-pointed assignees. To *Ogilvy, Mylne*, and *Company*, the intes-tate, *Thomas B. M'Kinnon*, was indebted by bond, in the sum of £4350. Their assignees appointed *Adam Tunno* and *James Cox*, of Charleston, attornies, to collect, in the United States and East Florida, all the debts due the bankrupts ; and the authority vested in these attornies, is similar to that which *Ogilvy, Mylne*, and *Co.* had previously conferred upon *Carnochan*. *Tunno* and *Cox*, according to the power vest-ed in them, substituted *Carnochan*, their attorney, to act in the state of Georgia, so far as it related to the collection of debts due the bankrupts, *Ogilvy, Mylne*, and *Co.*

The next documents produced, were two letters from *Bain*

and *Webster*, merchants of Nassau, New-Providence; and a bond for £4536 13s. 2d. from *Thomas B. M'Kinnon*, the intestate, to that firm. In a letter from these merchants, to *Carnochan*, dated 22d December, 1807, they say, " That they approve of *Carnochan's* attending to the property of the intestate, and have no objection to his administering on the estate, so far as they were concerned." In another letter, dated 22d July, 1808, they say, " We do not know how *we* can authorize you by power of attorney, to sue out administration. We were not left executors by any will of his, that we know of. Our authority is nothing more than as bond creditors; and, in fact, we are ourselves, and as attornies for *William Ogilvy*, Sen. Esq. the only bond creditors we know of. These bonds, no doubt, give us preferable claims of payment of our demands from the administrator, wherever he may be ; and if our having such preferable claims will authorize *you* to obtain exclusive administration on the late *Thomas B. M'Kinnon's* estate, you are at liberty to consider this letter as our complete sanction to sue out administration, so far as depends on us."

The next document introduced by the counsel, was a power of attorney from *Lydia Haven*, of Sloane-street, in the county of *Middlesex, England*, appointing *John Carnochan* and *James Johnston*, her attornies, to obtain administration on the estates of her husband, *Stephen Haven*, and *Charles M'Kinnon ;* the former of whom died in England, leaving his wife, *Lydia Haven*, his executrix ; the latter died intestate, in Nassau, New-Providence, and to take possession, and to dispose of negroes, and other property in Georgia, which belonged to the said *S. Haven*, and *Charles M'Kinnon*. In a letter of Mrs. *Haven's*, dated London, Sloane-street, March 31, 1809, she says, " If, as I conclude, you have obtained letters upon poor *Tom's* estate, I am sure I cannot wish it in better hands, and the power I have sent will not effect that measure in *the* least."

Do these powers of attorney, and letters devolve upon Mr. *Carnochan, jure representationis,* (if I may so express it) the rights which Mrs. *Haven* and the creditors, if they were here,

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

26

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

could have interposed to the administration ? No specific authority is given from *Ogilvy*, *Mylne*, and *Co.* to take out administration on the estate of *Thomas B. M'Kinnon*; nor was it possible to be given, as the powers of attorney bear date in August, 1804. The same observation will apply to the letters of attorney, from the assignee of *Ogilvy*, *Mylne*, and *Co.* for this power of attorney bears date in May, 1807, which was in the lifetime of the intestate. Mr. *M'Kinnon* was dead when *Tunno* and *Cox* executed their substitution; but this substitution refers to the power of attorney from the assignees, and can consequently delegate nothing more than would be warranted by that power of attorney.

I do not consider that a general authority to sue for, and collect debts, is necessarily a delegation of the appointer's right to apply for administration on the estates of intestate debtors. I do not, therefore, conceive, that the court of ordinary of Glynn, was legally bound to consider these powers of attorney as placing Mr. *Carnochan* precisely in the shoes of these assignees, if they were *here*, *had* applied for, and were entitled to, the administration as principal creditors. Messrs. *Bain* and *Webster* refuse to give Mr. *Carnochan* a power of attorney to sue out (as they express it) administration ; but inform him that he is at liberty to consider their letter as a sanction to apply for the administration, so far as their interests were here concerned.

Mrs. *Haven*, the sister, in 1801, and long after the knowledge of the death of her brother *Thomas*, transmits a power of attorney, by which *Carnochan* and *Johnston* are appointed her attornies, to take possession of, and to sell, or otherwise dispose of, negroes and other property of the estate of *Stephen Haven*, *Helen Haven*, and *Charles M'Kinnon* ; but not a word is said relative to her brother, *Thomas B. M'Kinnon*. This power of attorney must, consequently, rest upon the same basis as that of the assignees of *Ogilvy*, *Mylne*, and *Co.* It appears however from her letters of March, 1809, that she supposed *Carnochan* had obtained the administration, and expressed her satisfaction at it.

Except Mrs. *Haven*, then, and *Bain*, and *Webster*, no
other creditors have specifically expressed a wish, that the
administration should be conferred upon the appellant. Sup-
posing all disabilities removed, Mrs. *Haven* would certainly,
upon application, be entitled to the administration, as near-
est of kin.   But is it in her power so to transfer her right to
*any other person*, that the court of ordinary would be bound
to consider that person so completely her representative, as
to preclude the granting of administration to any other appli-
cant ? I think not ; and I will attempt to illustrate this posi-
tion, by a reference to a few legal doctrines.   Suppose A.
dies intestate, leaving a brother of the half blood, and an un-
cle, the ordinary in this case, would have no discretion. The
administration must be granted to the brother. 1 Vent. 425.
The brother, however, transfers his right to B., a stranger,
and solicits the administration for him.   Would any technical
obligation be imposed upon the court of ordinary, to consider
B. as the representative of the brother, and exclude the un-
cle from the administration ? Certainly not ; and upon the
refusal of the brother to assume the administration, the
court would be compelled to grant it to the uncle. Mr. *Car-
nochan*, therefore, can derive no legal claim to the adminis-
tration, from the expression of Mrs. *Haven's* wish, that he
should obtain it.   Having made these remarks, it is unneces-
sary to notice farther the letter of *Bain* and *Webster*, which
embraces, but more emphatically, the same point.   But ad-
mitting these conceptions to be erroneous, still it appears, from
the powers of attorney, and the other documents referred to,
that *Lydia Haven* and the creditors, are aliens ; *Ogilvy*,
*Mylne*, and *Co.* and their assignees, are merchants, of Lon-
don ; *Bain* and *Webster* are merchants, of a British pro-
vince ; Mrs. *Haven* resides in London, and in her power of
attorney, calls her father " formerly of Antigua." I am
induced to believe, therefore, that her father was a British
subject ; that she was born a British subject ; has also con-
tinued one, or is one at this moment.

The second section of the act, entitled, " An act to carry

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

into effect the sixth section of the third article of the constitution," declares, that no letters testamentary, or letters of administration, shall be granted to any person, or persons, who is, or are not, a citizen or citizens of the United States, residing in Georgia. The act of assembly is not singular in this respect. There is a similar law of the state of Maryland. 3 Cranch, 326.

Under this section of the law, a *citizen of the United States, who did not reside in Georgia,* could not obtain letters of administration. How much stronger, therefore, does the objection apply to Mrs. *Haven*, or any one of the creditors alluded to, whose domicil is proven by the exhibits of the appellant, to be in England.

If Mrs. *Haven*, or these creditors, then, could not, from their alienage and foreign residence, obtain administration, the question, so repeatedly put by the appellee's counsel, recurs, " Could they delegate to another, powers which they themselves did not possess?" Mr. *Solicitor* did, with great ingenuity, state one or two cases in which he attempted to establish the possibility of a right being communicated by a person who would not himself exercise it. But I take the clear principle of the law to be, that a derivative right cannot be greater than that from whence it is derived. The maxim, *qui facit per alium facit per se* would be rendered unintelligible and inoperative, if the principle can devolve upon his *agent* or *attorney*, privileges which *he* himself could not assume. The result of my opinion on this point, therefore, is, that neither Mrs. *Haven*, or these foreign creditors could obtain administration ; and consequently, they were incapacitated from deputing to Mr. *Carnochan*, a right of which they were divested by the law. I must confess, however, that the wishes of these creditors ought to have been respected by the court of ordinary of Glynn.

THEY *were the persons most deeply interested in an honest administration of the estate.* They had evinced an high confidence in the integrity of the appellant, and if *they* were satisfied that the administration should be entrusted to him, I

think it presented a consideration (other impediments being removed) which should have had an appropriate weight in the determination of the court.

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

I shall now examine the grounds taken by the appellee's counsel, and investigate the principles on which was founded the decision of the court below.

1. The first ground assumed by the counsel is, " that the appellee is also a creditor." The account which Mr. *Abrahams* presented, is for a very small amount—I think not more than forty dollars ; and could not be the basis of a competition with another creditor, claiming a debt so inconsiderable as that offered by the appellant. Upon this insulated ground, therefore, I have no hesitation in saying, that I consider the appellee's account as totally insufficient to found a claim to the administration upon.

2. The second ground taken by the appellee's counsel, denies, that upon a failure of kindred, a principal creditor is, *ex debito justitiæ*, entitled to the administration. It is in vain that we resort to the English authorities for satisfactory information on this subject. Mr. *Harris* did, with great skill and ability, endeavour to show, from the British books, that it was discretionary with the court of ordinary to grant administration, upon a failure of kindred to *any person* that court had the most confidence in ; and that therefore, the granting of administration to the *principal creditor*, or a *creditor* under such circumstances, was discretionary, and not, as it was thought, a matter of course. For the establishment of these positions he referred to Toler, an authority which professes to afford some additions to Wentworth, attributed to Justice Dodderidge, who is said to have compiled it under that fictitious name. Toler asserts that the ordinary exercises a discretionary right in granting administration to a principal creditor, yet I cannot find that opinion so expressed in any of the authorities I have referred to. I cite Toler from recollection, as, since the argument, all my efforts to procure this book have been unsuccessful.

The British statutes, as they relate to the administration

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

of intestate's effects stand in this order.    The ordinary once had the absolute disposal of the intestate's effects.    Of this power they were deprived by the  stat. of Westminster 2, which subjected them  to an action at the  suit of creditors. 3 Inst. 397. 2 Bac. Abr. 414.

The statute 31 Edw. 3. c. 11, enacts, that in case where a man dies intestate, the ordinary shall depute  the next and most lawful friends of the  deceased to administer  his goods. Law of Ex. p. 187.

Before this statute, the ordinaries might have  granted administration to whom they pleased.    The most lawful friends meant by this statute are the next of blood.    9 Co. 40.

The 22 and 23 Car. 2, compels the administrator to  make distribution, and  the  29 Car. 2, declares the right of husbands to demand administration on the estates of *feme coverts*, dying  intestate.    2 Bacon, Ab. 414.

The stat. 21 Hen. 8, permits  the ordinary to grant administration, either to the widow, the next of kin, or both ;  and gives the ordinary an  election to accept which he pleases of two in the same degree.    2 Black. Com. 495.

This is all I can find of *statutory law*, and it is silent on the subject of creditors.

Blackstone  lays it down, " that if none of the kindred will take out administration, a creditor may by *custom* do it." 2 Tuck. Blk. 505, refers to Salk. 38.

Blackstone, alludes I imagine, to the case of Blackborough *vs.* Davis, but nothing is said in that case of the *custom* to grant administration to the creditor, upon  the refusal of kindred.(*b*)

Blackstone is however a much higher and  more respectable authority than the one he refers to, and I shall therefore upon *his* authority take it as law, that the creditor is by *custom*, in England entitled to  the administration upon the refusal of kindred.    It has also been  the invariable  custom in

_____

(*b*) S. C. Lord Raymond, 684. 21 Mod. 615.

this state to grant the administration to a principal creditor, upon the refusal of, or failure of kindred.

Our act of Assembly of the 23d December, 1789, enacts, "that the same rules shall obtain in regard to the granting letters of administration on intestate's estates, as before mentioned for the distribution thereof." Marb. 217. And it farther enacts, "if any case should arise, which is not expressly provided for by this act, the same shall be referred to, and determined by the common law of this land, as it has stood since the first settlement of the state." *Ibid.* Now the right of a creditor to obtain administration is not expressly provided for by this act. Was therefore the custom spoken of by Blackstone, a part of the common law of this state, as that law "hath stood since the first settlement of this state?" The settlers of Georgia brought with them all the statutes, and common law principles of England, which were not hostile to their colonial relations. I mean all those statutory and common law principles which were in force, and obtained in the mother country anterior to the year 1732. The custom which Blackstone alludes to, was certainly prevailing at the time of the decision, in the case of Blackborough *vs.* Davis, and that was in 13 Will. 3, thirty years previous to the settlement of this state ; it must be considered, therefore, as a part of the law brought here by the settlers. This custom is recognised in the act of the provincial assembly of 1764, which the compilers of our digest have inserted as a revised statute. That act declares, "that no letters of administration shall hereafter be granted by the ordinary of this province to any person or persons whomsoever, as principal creditor or creditors, to any intestate, but upon special trust and confidence, and for the benefit of all and singular the rest of the creditors." Marb. and Crawf. Dig. 216. The language of this act is not mandatory. It does not direct that letters *shall* be granted to the principal creditor, but it establishes, beyond the possibility of refutation, the previous operation of the custom, to grant letters to a principal creditor, upon failure of kindred. With all deference, then, to

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

the argument of Mr. *Harris*, I do not think that the court of ordinary possessed a discretionary authority to reject the application of a principal creditor, the kindred having failed or refused the administration ; and that creditor labouring under no legal disability. This supersedes the necessity of adverting to the 3d ground of the counsel ; but it is said in the 4th ground, that the appellant's intermeddling with the effects, created a legal disability to his obtaining the administration.

*John Parling* in his testimony stated, that he was present when an inventory was taken of the property, under the direction of the appellant ; but he knows of no other facts of importance.

The affidavit of Mr. *Leach* establishes no fact that can have a legal bearing upon the case. It proves nothing of the intermeddling, and to that point I must confine myself.

The affidavit of *F. Parsons* states, that the appellant removed two negroes from the intestate's plantation, and that he, or a Mr. *Gibson*, acting under the appellant's instructions, had taken away three other negroes : and that the appellant assumed this authority in consequence, as this deponent understood, of Mr. *Wylly's* relinquishment of his application for the administration in favour of the appellant.

The appellant also by his letter of the 20th January, 1808, in his instructions to Mr. *Leach*, assumes an authority over the plantation and property on it, as if he had been legally empowered to do so. The letter from *W. Bain* was not so explained as to satisfy me whether he had been placed on the plantation of *Thomas B. M'Kinnon* by *Carnochan*, or whether the plantation he alludes to in his letter to *Parling*, of April 18, 1808, is intended to mean the plantation of *Carnochan*. The same difficulty presents itself as to the import of *Parling's* letter to *Bain*, which has no date.

*Bain's* affidavit is however explicit, and it states, that he was put on the plantation of the intestate by Mr. *Carnochan ;* and it establishes various inferences of Mr. *Carnochan*, and his agent *Parling*, which constitutes an *executor de son tort.*

The affidavit of Mr. *Wylly* contains no fact of importance.

The affidavit of Mr. *Ratcliff* contains nothing but what can be collected from *Bain's* deposition.

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

Another affidavit of *Robert Leach* proves an intermeddling of *Carnochan*, through the medium of his agent *Parling*.

*Carnochan's* letter to *Bain*, of the 19th February, 1808, is confirmatory of the fact, which is stated in the affidavit, of his having been employed by *Carnochan* to superintend and take charge of the intestate's negroes and plantation. Mr. *Carnochan's* letter to *Saunders*, the clerk, dated 10th May, 1808, acknowledges, that he has cotton of the estate in his hands, but declares, that in any thing he had relative to the estate, he had no intention of violating the law.

It was in consequence of these acts, that the court of ordinary, in their proceedings of the 2d May, 1808, deemed it improper that the administration should be confined to *Carnochan*, under which impression they have ever since resisted his application.

The court of ordinary of Glynn is composed of gentlemen of high worth, respectability, integrity, and information ; and in rejecting *Carnochan's* application, I can discover nothing but a solicitude to protect the interests of the intestate's estate. But however much I may respect that court, (which I very sincerely do,) I must, notwithstanding, be governed by what I consider the stubborn and established principles of law. *Fiat justitia ruat cœlum.* I cannot, therefore, avoid saying, that the whole of the evidence I have just detailed, has not been conformable to those immutable rules which must govern the court of ordinary, and every other tribunal. The court of ordinary is not bound by those rigid rules which obtain in a court acting upon the principles of the common law. All its testimony should be reduced to writing, and taken in the course of the investigation of the case in open court, and in the presence of all the parties, to whom a previous opportunity ought to be afforded to meet or to counteract that testimony, and to avail themselves of the benefit of any evidence which *they* may think proper to

27

GEORGIA,
Camden Co.
JUNE, 1810.

Carnochan
vs.
Abrahams.

introduce.    In taking this testimony the court of ordinary are not bound to adhere to any *formula;* they have only to observe and respect the maxim, *audi alteram partem.*    The testimony laid before me is *ex parte,* it was not taken in court, the opposite side had no opportunity of repelling it ; and is, therefore, a deviation from those fixed eternal rules, which should govern *every* tribunal of *every* description.

The conduct of Mr. *Carnochan* was exceptionable, it was calculated to excite the indignation of the court ; he committed acts which made him an *executor de son tort,* and in that capacity he immediately made himself responsible to the creditors.    But whether his conduct, supposing the evidence to be regular, was founded upon an ignorance of the consequence which would result from it, or from a deliberate intention of counteracting the authority of the court, I cannot determine.    It is a metaphysical point, which must be settled by his own conscience.

But admitting the evidence to be regular, I am still, I conceive, bound by principles of law to say, that having a *previous* right to the administration, it cannot be withheld upon the objection, that he has made himself an *executor de son tort*.    In England it does not prevent administration.    Lord Kenyon, in Curtis *vs.* Vernon. 3 Term Rep. 590, refers to the case of Vaughan *vs.* Brown, in 2 Sta. 1106, where the court said, "it would be extremely hard, that if a person entitled to administration is *opposed* in the ecclesiastical court, and does any acts *prudente lite,* to make himself executor *de son tort,* these acts should not be purged by his afterwards obtaining letters of administration."    And they added, "that granting of administration *legalizes* those acts which were tortuous at the time."    The cases cited by the solicitor show, that an executor *de son tort,* may afterwards have the administration committed to him.    The case from Strange, and the weight given to it by the high authority of lord Kenyon show, that administration may be granted to an *executor de son tort,* and that this administration purges and legalizes his tortuous acts.

The case of Bradbury *vs.* Reynel, in Cro. Eliz. 565, and which was particularly relied on by Mr. *Solicitor*, does not controvert the doctrine, that administration may be committed to an *executor de son tort*, but it denies that such administration purges his tortuous acts ; the language of that case is, " although administration is committed to a stranger, in regard that he has once made himself chargeable to the plaintiff's action, as being *executor de son tort*, he shall not afterwards discharge himself by matter *ex post facto.*"

Upon the authority of this case, Mr. *Solicitor* admitted, that the appellant would always be liable for his acts as *executor de son tort*, but that those acts could not prevent his obtaining the administration, if he possessed a right to it. The modern decision in Term Reports, which sanctions the case in Strange, is to me more rational than the case in Croke, and it ought to be considered as having shaken so much of the authority of that case, which declares the liability of the administrator for all the acts which he had committed as *executor de son tort*. It appears, however, from all the cases, that being an *executor de son tort*, does not, *per se*, destroy the right to administration. There being no other disability, it must be granted to him, the court of ordinary taking care to require security, commensurate with the mischief they have reason to anticipate from his previous conduct.

Upon the whole of this investigation the corollary is irresistible, that the appellant is entitled to the administration. This case is therefore remitted to the court of ordinary of Glynn ; and the justices of that court are hereby directed to commit the administration of the estate and effects of *Thomas B. M'Kinnon* to the appellant *John Carnochan.*(*a*)

*Bulloch, Davis, Berrien, Miller,* and *Lawson,*

for Appellant.

*Harris, Stites,* and *Cuyler,* for Appellee.

---

(*a*) The conclusion of this decision, as it appears upon the minutes of the court, has been omitted, because it is not connected with any principle upon which the judgment of the court rested, and has therefore no other authority than as an *obiter dictum ;*

It is in these words: "It appearing, however, that Mr. *M'Kinnon* has died, leaving no heirs in this state, capable of inheriting his estate, or the other of the escheat laws may probably fix itself upon his property. I suggested this difficulty at the argument; and such an impression was made upon my mind by the first section of the act to amend an act, entitled " an act to regulate escheats," laws of 1805, p. 23, that I then thought it would be a saving of time, and farther investigation, to ascertain by an issue, whether Mr. *M'Kinnon* had died without will, and without heirs in this state, or the United States. If this should be the fact, the court of ordinary of Glynn, will, I apprehend, still have it in their power to prevent the benefits which the appellant anticipates from his administration. I am aware of the sensations this opinion may produce, and have, therefore, given it with regret. But I hope there is sufficient solidity in the doctrines advanced, to convince the court of ordinary of Glynn, that I have obeyed only the principles of the law."